# Case No. 9,473.

## The MERRIMAC.

### [1 Ben. 201.] ¹

District Court. E. D. New York.　June, 1867.

SALVAGE—TROOPS TRANSPORTED—CONTRACT WITH GOVERNMENT—PASSENGERS.

1. Where a regiment of soldiers of the United States was being transported from New Orleans to New York upon a steamer, under a contract between the owners of the steamer and the government, and the vessel, having sprung a leak, was saved from sinking by the labor of the troops for four days and three nights in bailing the vessel, working under the command of the officers of the regiment, and continuing their

¹ [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

labor after the vessel was brought so near shore that she might have been beached or the men landed in boats, and until, by the help of another steamer which came to her assistance, she was brought to the Mississippi bar and was thus saved from a total loss, *held,* that the relation of the troops to the ship was not that of passengers, and that they could recover salvage compensation for their services.

[Cited in White v. McDonough, Case No. 17,-552.]

2. Even if they had been passengers belonging to the ship by virtue of a passenger contract, the court might well award them salvage by reason of the services performed by them after the vessel was in sight of the beach and they could have escaped from her.

[Cited in The F. I. Merryman, 27 Féd. 314.]

[This was a proceeding by Joseph Forbes against the Merrimac. It was pleaded by the defendants that the libelants should have made themselves parties to another suit pending in the Eastern district of Louisiana by Charles Morgan and others, claiming salvage against the Merrimac. The case came up upon exceptions to the article of the defendants' answer setting up this defence. The exception was allowed and leave given to reform answer. Case No. 4,927.]

This suit was brought to enforce a claim for salvage preferred by a large number of persons formerly comprising a colored regiment of the United States army. The facts were as follows: The steamer Merrimac left the port of New Orleans in the month of November, 1865, bound to this port, laden with cotton and troops. On the morning of Saturday, the 11th, she sprung a leak, which increased to such a degree as to compel her to put back to New Orleans, then some two hundred miles distant. The water soon choked the pumps, and the crew commenced to bail, notwithstanding which the leak gained rapidly and by two o'clock on Sunday morning had fully extinguished the fires, and the engine stopped. Up to this time the effort to keep the vessel afloat had been confined to bailing from the engine room, which had been done at first by the crew, who had been gradually relieved by the men of the regiment, whom the commanding officer had called up, until the labor had passed entirely into the hands of the soldiers. The water, however, continued to gain, and was some seven feet in the hold at this time. The master of the steamer, who appears to have been a competent man, and whose conduct does him credit, then informed the major commanding that the work of bailing must be made a regular thing by the regiment, whereupon the major issued orders to organize the regiment into two reliefs of five companies each, to work two hours on and two hours off. This was done, and in this manner, under the immediate direction of its officers and under military discipline, the bailing, by hand, by buckets and tubs from places in the engineers' room, and by barrels hoisted by a whip from two hatches, was continued by the regiment without intermission and with such success that the water was kept nearly at a stand-

still. The crew of the vessel were for the most part engaged in emptying the barrels and in the navigation of the vessel, she being then under sail, but poorly equipped for that purpose, and unable to hold her course upon a wind. On Sunday night a sail appeared in sight, when guns were fired and rockets sent up, in hopes to bring her to their assistance, but without avail. On Monday evening a light was made, which proved to be the Timbalier light, some forty-five miles west of the Mississippi bar. The weather was then fair, and the steamer came to anchor in ten fathoms of water, with the beach in plain sight. Soon after the lights of a vessel were seen and signals of distress were again made, which brought to their aid the steamer Morgan. From this steamer the true position of the Merrimac was learned and more buckets procured, and at the request of the master, the Morgan lay by her during the night, and next morning took her in tow, and towed her to the bar, on which she at once grounded at four p. m., Tuesday. Up to this hour the bailing had been continued by the men of the regiment, directed by its officers, without cessation, night or day. The labor had been severe and exhausting; some of the officers were without sleep for three nights; the water gave out, and was only supplied by a shower of rain which fell. No regular meals were served, and the men would drop asleep as soon as relieved, and were often with difficulty roused again by their officers, who went around for the purpose twenty minutes before each relief was to be put to work. When the vessel anchored off the Timbalier light her position was unknown to the master; but the beach was in plain sight, and while at anchor the water was smooth, so that the steamer could have been beached and the men could have been landed in the boats. No effort was made to abandon her, but, on the contrary, the major stationed guards at the boats to prevent any resort to them for that purpose by any one, and his men were kept bailing, the regiment working with the regularity of a machine; and, so far as the leak was concerned, effectually supplying the place of the engine which had been stopped by the water, only ceasing when the steamer reached a place of safety on the bar, within reach of the steam pumps, whence she was towed to her dock.

Emerson & Goodrich, W. R. Beebe, and E. C. Benedict, for libellants, cited the following authorities: 2 Pars. Mar. Law, 601, 602; Newman v. Walters, 3 Bos. & P. 612, and cases cited; The Great Eastern, 11 Law T. (N. S.) 516; The Joseph Harvey, 1 C. Rob. Adm. 307.

Spencer, Hoes & Metcalf and C. A. Rapallo, for claimants cited the following additional authorities: 2 Conk. Adm. pp. 345, 348; Abb. Shipp. (6th Am. Ed.) p. 669; The Neptune, 1 Hagg. Adm. 236; The Branston, 2 Hagg. Adm. 3; The Two Friends, 1 C. Rob. Adm. 285; The Salacia, 2 Hagg. Adm. 263; The Hope, 3 Hagg. Adm. 423; Bond v. The Cora [Case No. 1,620]; The Vrede, 1 Lush. 322.

BENEDICT, District Judge. It cannot be disputed that this valuable steamer, with her cargo, was in a position of very great peril, from which it was rescued by severe and exhausting labor performed by the libellants. But while the service is admitted, it is contended that the case is not one where salvage can be awarded. The main objection of many which have been ably presented by the claimants, is that the persons who performed the service in question were passengers, and that the service consisted of ordinary physical labor, within the line of the duty, which, as passengers, they owed to the ship. To this objection it is answered by the other side that the circumstances attending the rendition of the service were extraordinary, and the labor performed was not such as is included in a passenger's duty, and, further, that the libellants were not passengers within the meaning of the rules regarding salvage. The fact that a large steamer leaking as this one was, with from seven to ten feet of water in her hold, was kept afloat for the space of four days and three nights by the process of hand bailing, is undoubtedly an extraordinary occurrence, made possible in this case only by the circumstance that this large number of men were kept constantly at work and with great efficiency by the powerful aid of military discipline, judiciously but firmly applied by the officers of the regiment; but it may admit of doubt whether the circumstances were such as to change the character of the service and take it out of the category of ordinary labor, which it is said may be required of a passenger belonging to a ship which is in danger.

The determination of this question is unnecessary in the present case, inasmuch as I am of the opinion that the libellants did not sustain that relation to this steamer which is designated by the word "passenger" in the rules applied to salvage demands. The reason of the rule in question indicates the class of persons to which it relates. Passengers are not allowed salvage reward for ordinary labor performed by them in saving their ship, because such labor is made the duty of the passenger by the pre-existing contract under which he connected himself with the ship. 3 Kent, Comm. 314. Manifestly such a duty, the liability to which and the extent of which must vary according to the voyage, the character and outfit of the vessel, the competency of her master, and many other like circumstances peculiar to each case, can only arise out of a voluntary agreement. The duty rests in contract. It is a "covenanted allegiance:" the pre-existing covenant spoken of by Lord Stowell. The Neptune, 1 Hagg. Adm. 236. This being so, I am unable to see how the libellants are to be considered

as within the rule. They made no contract with the ship, had no power of selection of the ship, or the voyage even. They paid no passage money and incurred no liability for any. They acquired no right of action against the ship in case of failure to transport them. They were not fed or furnished by the ship, and had no interest whatever in being transported in her, but were men simply compelled by the orders of their superior officers to go on board this vessel at a certain time, to leave again whenever ordered by their officers. The government, it is true, had contracted with the ship for the transportation of this body of troops from New Orleans to New York, and to pay for their transportation, but privity of contract between the men and the ship, which would make ordinary labor for the ship in distress a duty, is wanting. That the position of these men on board was not considered by the master to be that of ordinary passengers is apparent from the fact in evidence that the master issued no orders to them, and did not undertake to direct their labors, but applied to the commanding officer of the regiment to issue his orders and to keep them to the work under his direction. This view is also confirmed by the circumstance which, although not recollected by the master, is proved by Major Bumstead, the commanding officer, whose appearance and mode of giving his evidence add weight to his statement, that when the master first spoke to him of the likelihood of being compelled to call upon him for men to assist in bailing, he said that the men, of course, should be paid. But it is said that the men were not the crew or the cargo, and, therefore, must have been passengers. This does not follow. A man may personally be on board a ship and be neither master, crew, nor cargo, and yet not sustain the legal relation of passenger, as was held by Dr. Lushington in the case of The Hanna, 15 Law T. (N. S.) p. 334. My conclusion, therefore, is that the service performed by the libellants cannot be held to have been performed by them in the line of any duty as being passengers. Having thus disposed of the main question, it is only necessary to say that the other objections raised by the claimants, have been heretofore passed on by the court. The fact that they were soldiers and in peculiar relations to the government, is no defence, as many cases in the books will show. That they saved their own lives with the ship does not bar them from reward, nor is it good ground of objection that they did only what was their bounden duty as men. It is, indeed, the bounden duty of every man to labor when he can to save the lives and property of his fellow man. And it is to encourage the performance of this duty that the maritime law, out of considerations of public policy, awards compensation for its performance. Performance of a duty imposed by contract is not rewarded, but services rendered in pursuance of the dictates of humanity, and prompted by a desire to perform the obligations which attach to every man, these are the very services which, when they result in the saving of property, are rewarded by a court of admiralty. Again, it is said, that the services involved no risk, enterprise, or disinterestedness, and that these are necessary characteristics of every salvage service. The rule is stated too broadly. The Clifton, 3 Hagg. Adm. 121; The Enterprise, Ship. Gaz. 1854; The Black, Ship. Gaz. 1854; The Purissima Concepcion, 3 W. Rob. Adm. 184. And besides, this service was not wholly wanting in these characteristics. The labor here performed might well involve risk to health, and certainly the mode of its performance under the circumstances, displayed much patience, willingness, and subordination.

The case presents another feature which is entitled to notice here. It appears in evidence here, that when the steamer reached the place where she anchored, the beach was in plain sight. The weather was then fine, and the sea soon became smooth. The steamer could then have been beached, or the troops landed in the boats; instead of which, guards were stationed at the boats by the major commanding, to prevent any one from attempting to resort to them, and the men were kept at the exhausting labor all that night and during the next day, and until the steamer was safely grounded on the Mississippi bar. This labor, performed after the steamer came to anchor, was for the sole purpose of saving the ship and cargo. Had the bailing been stopped, the steamer would have sunk and been lost, although the lives of those on board would have been saved. And this labor was willingly performed by men who were already worn with labor, want of sleep, and proper food, and who had the physical power to control the ship as well as their own actions. This feature of the case might justify an award to the libellants, even if they had been passengers belonging to the ship by virtue of a passenger contract; but I do not rest my decision upon this ground, but upon the ground that the libellants were not passengers, within the meaning of the rule which denies compensation to passengers, and are consequently entitled to a proper reward for the labor they performed, and I deem the considerations of public policy, upon which the whole doctrine of salvage rests, to be fully applicable to the present case, and to require that the good order, patience, and willingness with which this large body of men—soldiers as they were, with arms and the power to provide as they pleased for their own safety—labored constantly to keep the ship afloat, should be recognized in a court of admiralty. There remains to determine the amount proper to be awarded. Upon this question, as the case is peculiar, not only in some of the circumstances attending the service, but in the number of persons claiming to be rewarded, and as

no argument upon this point is submitted, in behalf of the claimants, I desire before determining it to hear the views of counsel.

On hearing counsel, the court fixed the amount of salvage at two months' pay for each officer and man, according to the rate received by them in the military service. There were three hundred and fifty-one persons who appeared as libellants in the suit. The vessel was valued at two hundred and fifty thousand dollars, and the amount of salvage decreed was twenty thousand five hundred and thirteen dollars. No appeal was taken from the decree.